1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10              San Francisco Division

11  T.D.P.,                                    Case No. 3:16-cv-04132-LB

12              Plaintiff,

13      v.                                     **ORDER GRANTING IN PART AND
                                               DENYING IN PART MOTION FOR
14  CITY OF OAKLAND, et al.,                   SUMMARY JUDGMENT**

15              Defendants.                    Re: ECF No. 94

16

17

18  RICHARD PERKINS, III, et al.,              Case No. 3:16-cv-04324-LB

19              Plaintiffs,                     **ORDER GRANTING IN PART AND
                                               DENYING IN PART MOTION FOR
20      v.                                     SUMMARY JUDGMENT**

21  CITY OF OAKLAND, et al.,                   Re: ECF No. 75

22              Defendants.

23

24                       **INTRODUCTION**

25      In November 2015, four Oakland police officers shot and killed Richard Perkins II, who was

26  carrying a pellet gun that looked like a semiautomatic pistol. The parties dispute whether the gun

27  was in his waistband or in his hand and whether the officers warned Mr. Perkins before they fired at

28  him. The plaintiffs — Mr. Perkins's mother and two children — filed civil-rights lawsuits charging

excessive force in violation of the Fourth Amendment, interference with familial rights of association in violation of the Due Process clause of the Fourteenth Amendment, governmental-policy liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1989), supervisory liability, and similar state-law claims.[1] The defendants moved for summary judgment on all claims.[2] The court grants the motion in part and denies it in part. The court grants the motion for summary judgment on the Fourteenth Amendment, *Monell*, and supervisory-liability claims and otherwise denies the motion because triable issues of fact preclude judgment as a matter of law.

## STATEMENT

In November 2015, officers from the Oakland Police Department ("OPD") broke up a sideshow — an illegal event where motorists perform stunts with cars or motorcycles in public streets or vacant lots — near 90th Avenue and Bancroft Avenue in Oakland, California.[3] After the officers arrived, most sideshow participants fled, but the officers detained and cited three persons for Vehicle Code violations and confiscated four off-road motorcycles.[4] While the officers were waiting for tow trucks to arrive, they had a debriefing while standing near their police cars, just off the west curb in the number two southbound lane of the 2220 block of 90th Avenue, next to the 24-7 Gas and Food Mart located at 8930 Bancroft Avenue in Oakland (at the corner of Bancroft

[1] *T.D.P.* Compl., No. 3:16-cv-04132-LB – ECF No. 1 at 8–16 (¶¶ 31–57); *Perkins* Compl., No. 3:16-cv-04324-LB – ECF No. 1 at 4–9 (¶¶ 23–47). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents. Unless otherwise noted, this order cites to the docket in *T.D.P. v. City of Oakland*, No. 3:16-cv-04132-LB.

[2] *T.D.P.* Mot. for Summary Judgment, No. 3:16-cv-04132-LB – ECF No. 94; *Perkins* Mot. for Summary Judgment, No. 3:16-cv-04324-LB – ECF No. 75.

[3] Hughes Decl. – ECF No. 94-24 at 3 (¶¶ 2, 5).

[4] OPD Administrative Report –ECF No. 102-7 at 5. Part of the report is sealed. *See* Sealing Order – ECF No. 109 at 5–6. The parties do not dispute most of the sealing. *See id.* at 5. To the extent that this order cites parts of the report that are sealed, those parts are unsealed based on the reasoning in the court's previous sealing order. *See id.* at 5–6. The report is admissible as a public record under Federal Rule of Evidence 803(8). *See id.* at 5; FED. R. EVID. 803(8) (hearsay exception for "factual findings from a legally authorized investigation," and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness); *see Montiel v. City of Los Angeles*, 2 F.3d 335, 341 (9th Cir. 1993) ("Public records and reports falling under Rule 803(8)[] are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence.'") (quoting *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988)).

Avenue and 90th Avenue).[5] At around 5:30 p.m., twelve officers were present, all in uniform, and the five police cars had their emergency lights flashing.[6] Ten officers (who mostly faced west) formed a semicircle around Sergeant Joseph Turner (who faced east), at the rear of his car.[7] A twelfth officer was in his car, completing a report.[8]

At 5:34 p.m., it was dusk and getting dark.[9] Officer Allahno Hughes — a new police officer who had finished his field training in July — saw Mr. Perkins about 40 feet away, walking toward the officers, wearing dark blue jeans and a black sweatshirt with the hood pulled over his head.[10] Officer Hughes yelled something to the effect of "Code 7," the term that OPD uses when someone has a gun or a weapon.[11] Other officers heard the warning.[12] Officer Hughes, formerly in the Marine Corps reserves and deployed to Iraq, later reported that he saw Mr. Perkins with a gun that he identified as a Desert Eagle pistol.[13] Four officers shot at Mr. Perkins a total of 14 times in 3.6 seconds: Officer Hughes (four shots); Sergeant Turner (four shots); Officer Joshua Barnard (four shots); and Officer Jonathan Cairo (two shots).[14] Officer Hughes fired the first two consecutive

---

[5] Scene Diagram, Ex. A to Chavez Decl. – ECF No. 94-20 at 2; OPD Administrative Report – ECF No. 102-7 at 5, 65–67 (enlarged diagram); Turner Dep. – ECF No. 121 at 24–25 (pp. 83:24–88:13); Hughes Dep. – ECF No. 111 at 23–24 (pp. 81:4–82:20).

[6] Camera 10 Video, Ex. B to Loebs Decl. – ECF No. 94-3; Scene Diagram – Ex. A to Chavez Diagram – ECF No. 94-20 at 2; Hughes Decl. – ECF No. 94-24 at 3 (¶ 2); Administrative Report – ECF No. 102-7 at 5; Hughes Dep. – ECF No. 111 at 23 (pp. 80:5–81:3).

[7] OPD Administrative Report – ECF No. 102-7 at 50 (officers' locations).

[8] *Perkins* Martinez-Contreras Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 160 (p. 14:14–18).

[9] Camera 10 Video, Ex. B to Loebs Decl. – ECF No. 94-3; OPD Administrative Report – ECF No. 102-7 at 5. The court takes judicial notice that on November 15, 2015, the sun set at 4:57 p.m. and twilight ended at 5:25 p.m. *See* https://www.timeanddate.com/sun/usa/oakland?month=11&year=2015 (last checked January 20, 2019).

[10] Hughes Decl. – ECF No. 94-24 at 3–4 (¶ 8); Hughes Dep. – ECF No. 111 at 8 (p. 18:1–24).

[11] Hughes Dep. – ECF No. 111 at 25 (pp. 87:16–88:10).

[12] *See infra* (summarizing deposition testimony).

[13] Hughes Dep. – ECF No. 111 at 8–9 (pp. 21:16–22:2), 24–25 (pp. 84:17–85:20, 86:23–87:4); Hughes Decl. – ECF No. 94-24 at 4 (¶ 10).

[14] Forensic Report, Ex. B to Greene Decl. – ECF No. 94-23 at 5 (timeline of shots); Ballistics Report, Ex. C to Loebs Decl. – ECF No. 94-4 at 2; Crime Report, Ex. D to Loebs Decl. – ECF No. 94-5 at 2.

shots at Mr. Perkins.[15] Then — within 2.4 seconds[16] — the officers more or less simultaneously fired: Officer Hughes (two consecutive shots); Sergeant Turner (four consecutive shots); Officer Barnard (four consecutive shots); and Officer Cairo (two consecutive shots).[17] Mr. Perkins sustained 15 bullet wounds and died at the scene.[18] His body position was about 20 feet from the nearest patrol vehicle, where the officers were standing at the time of the debriefing.[19]

Mr. Perkins's gun was a pellet-gun "Desert Eagle" pistol, which is made by the same company (Magnum Research, Inc.) that makes the Desert Eagle .50 caliber semiautomatic pistol.[20] It was 11 inches long with a 5 and ¾ inch barrel that can shoot .177 caliber pellets.[21] The photographs below are (on the left) a Desert Eagle semiautomatic pistol, and (on the right) Mr. Perkins's pellet gun.[22]

 

---

[15] Forensic Report, Ex. B to Greene Decl. – ECF No. 94-23 at 5 (showing shot timeline).

[16] *Id.*

[17] OPD Administrative Report – ECF No. 102-7 at 19; Ballistics Report, Ex. C to Loebs Decl. – ECF No. 94-4 at 2; Crime Report – Ex. D to Loebs Decl. – ECF No. 94-5 at 2.

[18] Coroner's Report, Ex. H to Sorensen Decl. – ECF No. 118 at 2–3, 8–13.

[19] Scene Diagram, Ex. A to Chavez Decl. – ECF No. 94-20 at 2; OPD Administrative Report – ECF No. 102-7 at 65–67 (enlarged version).

[20] Hughes Decl. – ECF No. 94-24 at 4 (¶¶ 14–15).

[21] *Id.* (¶ 14); Mot. – ECF No. 94 at 13 n.6 (citing manufacturer specifications).

[22] Pictures of Pellet Gun and Desert Eagle Semiautomatic Pistol, Exs. C & D to Hughes Decl. – ECF Nos. 94-27 and 94-28. The court viewed the pellet gun at the January 24, 2019 summary-judgment hearing.

Two security cameras at the adjacent gas station recorded the shooting.[23] The image quality is poor. "Camera 2" was about twenty feet west of Mr. Perkins's location when he was shot, and "Camera 10" was about eighty feet west.[24] In the Camera 2 video, Mr. Perkins enters the frame from the left, walking southbound (toward the officers) along the 90th Avenue sidewalk.[25] It is dark.[26] A lighter-color shirt is visible below his sweatshirt.[27] His right arm goes up over his head, and an object (the pellet gun) is visible for the first time, in the air, separated from his body, near his right hip.[28] Mr. Perkins twists back to his right and falls to the ground on his left side.[29] The pellet gun falls on the ground near his right foot, and Mr. Perkins rolls further away from the gun, first two or three feet away, and then about four feet away.[30] In the Camera 10 video, officers turn toward Mr. Perkins's direction, and an officer raises his arms in a firing position, before Mr. Perkins enters the camera's view.[31] Mr. Perkins is visible only after he is shot and falls to the ground.[32] There are muzzle flashes after Mr. Perkins is on the ground on his back.[33]

An exhibit shows the frames from the two videos side by side, accounting for the different recording speeds of the two cameras.[34] Camera 10 recorded 10 frames per second (one every 100

---

[23] Camera 2 Video and Camera 10 Video, Exs. A & B to Loebs Decl. – ECF Nos. 94-2 and 94-3.

[24] Scene Diagram, Ex. A to Chavez Decl. – ECF No. 94-20 at 2.

[25] Camera 2 Video, Ex. A to Loebs Decl. – ECF No. 94-2.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*; Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 4. The Fredericks Report was lodged with the court in electronic format and not filed on the docket, and therefore does not contain ECF-generated headers. The pin cites for the Fredericks Report refer to the page numbers at the bottom of the report.

[31] Camera 10 Video, Ex. B to Loebs Decl. – ECF No. 94-3.

[32] *Id.*

[33] *Id.*

[34] Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 14 (image-examination PDF), 14–17 (descriptions of images). Mr. Fredericks accurately describes the camera images. Ordinarily, the court would allow expert testimony at trial only about the process to create the video images and would not allow expert testimony about what the images depict because a lay person can see what the images are. *Zeen v. Cty. of Sonoma*, No. 17-cv-02056-LB, 2018 WL 3769867, at *2 (N.D. Cal. Aug. 9, 2018); *see*

milliseconds), and Camera 2 recorded seven frames per second (one every 143 milliseconds).[35] At 17:34:10, the officers are grouped near a squad car (Camera 10, slide 4).[36] At 17:34:11, an officer turns toward Mr. Perkins (Camera 10, slides 13 to 17) and Mr. Perkins enters the camera's view (Camera 2, slide 18).[37] The officer raises his arms to a shooting position at 17:34:12 (Camera 10, slides 33 to 42).[38] At 17:34:13, Mr. Perkins is more visible; he is wearing the black hooded sweatshirt, and a lighter shirt is visible at the bottom of the sweatshirt (Camera 2, slides 38 to 47).[39] His right hand is at his side (Camera 2, slide 49).[40] At 17:34:14, Mr. Perkins's right hand moves up to the height of his right shoulder, and he spins back to his right and begins to fall to the ground (Camera 2, slide 56).[41] At 17:34:14, Mr. Perkins is spinning to his right and falling down to his left, his lower right jacket is swinging outward to the right (showing more of the lighter shirt), and the gun is visible for the first time as a blurred object in the air near his right hip (Camera 2, slide 59).[42] He continues to fall to the ground, with his right hand visible over his right shoulder (Camera 2,

---

*also Lee v. Anderson*, 616 F.3d 803, 808–09 (8th Cir. 2010) (allowing expert to testify about how he modified the video but disallowing testimony about whether the video showed that the plaintiff did not have a gun because "the jury was entirely capable of analyzing the images and determining whether [plaintiff] had anything in his hands," and the expert's opinion "would not have assisted the jury but rather would have told it what result to reach"); *Lam v. City of San Jose*, No. 14-cv-00877-PSG, 2015 WL 6954967, at *2 (N.D. Cal. Nov. 10, 2015) (audio expert may explain enhancement process and play the enhanced audio but cannot testify about what the recorded person said). But given the poor quality of the images and the hours it took the court to confirm the expert's account, his frame-by-frame account may be useful to the trier of fact. After all, in the ordinary case, the plaintiffs might have a sponsoring witness to talk about the images. They do not in this case because Mr. Perkins is dead. In any event, at summary judgment, the court verified the facts through its intensive review of the images. The defendants concede that the video is consistent with the officers' accounts. Reply – ECF No. 129 at 8. For example, it does not show the location of the gun when it left Mr. Perkins's hand or body. *Id.* The expert identifies only when the gun becomes visible in the video. *See infra* (discussing this point). The court can address the extent of trial testimony in its order on any motion *in limine*.

[35] Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 3, 13–14.

[36] *Id.* at 14 (image-examination PDF).

[37] *Id.* at 14 (image-examination PDF), 15 (description of images).

[38] *Id.* at 14 (image-examination PDF), 15 (description of images).

[39] *Id.* at 14 (image-examination PDF), 15 (description of images).

[40] *Id.* at 14 (image-examination PDF), 15 (description of images).

[41] *Id.* at 14 (image-examination PDF), 15 (description of images).

[42] *Id.* at 14 (image-examination PDF), 16 (description of images).

slide 61).[43] He falls to the ground on his left side, and the gun falls near his right foot (Camera 2, slide 62).[44] He rolls to his right, on his back, and the gun is two or three feet from his feet (and farther from his hands) (Camera 2, slide 64).[45] At 17:34:15, Mr. Perkins rolls back further to his right, and the gun is now about four feet from his left foot (and farther from his hands) (Camera 2, slides 67 and 68).[46] At 17:34:15, there are two muzzle flashes from one officer's gun (Camera 10, slides 69 and 73), after Mr. Perkins is on the ground, on his back (Camera 2, slides 69 and 73).[47] The first flash is approximately 715 milliseconds (Camera 10) after the gun is first visible falling to the ground (Camera 2) and the second is approximately one second (Camera 10) after the gun is visible falling to the ground (Camera 2).[48] It is not possible to create an accurate record of each muzzle flash visible to the human eye during the shooting because muzzle flashes that occurred between frames (separated in time by 100 milliseconds for Camera 10) are not recorded.[49]

According to ShotSpotter, the shots were fired as follows:[50]

| Shot | Time |
| --- | --- |
| 1 | 17:34:11.159 |
| 2 | 17:34:11.525 |
| 3 | 17:34:12:725 |

---

[43] *Id.* at 14 (image-examination PDF), 16 (description of images).

[44] *Id.* at 14 (image-examination PDF), 16 (description of images).

[45] *Id.* at 14 (image-examination PDF), 16 (description of images).

[46] *Id.* at 14 (image-examination PDF), 17 (description of images).

[47] *Id.* at 14 (image-examination PDF), 17 (description of images).

[48] *Id.* at 17.

[49] *Id.*

[50] Forensic Report, Ex. B to Greene Decl. – ECF No. 94-23 at 5; ShotSpotter Audio Recording, Ex. A to Greene Decl. – ECF No. 94-22. ShotSpotter has three primary components: acoustic sensors, a location-server application, and the ShotSpotter Flex user interface. Forensic Report, Ex. B to Greene Decl. – ECF No. 94-23 at 2. Each acoustic sensor is triggered by impulsive sounds in its environment. *Id.* The acoustic measurements of these sounds and the time that they are detected are transmitted to the location server as possible gunshots. *Id.* The location server analyzes the data received and determines whether the impulsive sound can be geographically located and classified as gunfire. *Id.* If it can be located and classified as gunfire, the location server reports the incident to the ShotSpotter service-operations center, where a human operator reviews the incident for classification accuracy. *Id.*

| | |
|---|---|
| 4 | 17:34:13.081 |
| 5 | 17:34:13.381 |
| 6 | 17:34:13.693 |
| 7 | 17:34:14.074 |
| 8 | 17:34:14.226 |
| 9 | 17:34:14.334 |
| 10 | 17:34:14.449 |
| 11 | 17:34:14.539 |
| 12 | 17:34:14.596 |
| 13 | 17:34:14.653 |
| 14 | 17:34:14.807 |

There is a command on the ShotSpotter audio that sounds like "ground" before the first two shots were fired, and a command to "get on the ground" before the remaining shots were fired.[51]

At 17:34:34, an officer picks up the gun (Camera 2, slides 346 to 352).[52] (The officer was Officer Hughes, who realized then that it was a "replica" based on its weight.[53]) At 17:34:36, he puts it back on the ground, two to three feet from its original position and farther away from Mr. Perkins's body (Camera 2, slide 378).[54]

Officer Hughes turned his body camera on immediately after the shooting.[55] It records the following conversation between Officers Hughes and Faeth:

[51] ShotSpotter Audio Recording, Ex. A to Greene Decl. – ECF No. 94-22; Forensic Report, Ex. B to Greene Decl. – ECF No. 94-23 at 5. The defendants characterize the first command as inaudible, Mot. – ECF No. 94 at 14–15 n.10, and it was hard to hear on the court's overhead system, but the version on the lodged CD was audible.

[52] Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 14 (image-examination PDF), 17 (description of images).

[53] OPD Administrative Report – ECF No. 107-7 at 26.

[54] Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 14 (image-examination PDF), 17 (description of images).

[55] Body Camera Recording, Ex. F to Sorensen Decl. – ECF No. 116-1.

Officer Hughes:   Oh my God, I thought he was trying to fucking get — he was, man.
Officer Faeth:      Hey, he, he reached.
Officer Hughes:   He had it out. He fucking had it out. He had it out, dude."
Officer Faeth:      I just saw his hand on it. All right. Just —
Officer Hughes:   Oh, fuck man.[56]

It is undisputed that Mr. Perkins said nothing to the officers.[57]

The next sections summarize (1) the officers' accounts of the shooting, (2) a civilian eyewitness's account, (3) other evidence, and (4) the relevant procedural history.

## 1. Officer Accounts of the Shooting

### 1.1 Officer Allahno Hughes's Account

During the debriefing, Officer Hughes saw Mr. Perkins walking down the sidewalk on 90th Avenue, toward the officers, and made eye contact with him.[58] Mr. Perkins had a "determined" look, "like he was ready to get down," which concerned Officer Hughes given the obvious police presence and squad cars with flashing lights.[59] When Mr. Perkins was about 40 feet away, he — without breaking eye contact with Officer Hughes — reached under his sweatshirt with his right hand and into his pants, and pulled a gun "up and out and set it down by his leg."[60] Officer Hughes "immediately identified it as a Desert Eagle pistol, which [he] underst[ood] to be one of the most powerful handguns made."[61] He yelled something to the effect of, "Code 7" or "this guy is Code 7" (meaning, the person has a gun or a weapon) to warn the other officers.[62]

---

[56] Transcript of Body Camera Recording, Ex. F to Sorensen Decl. – ECF No. 116 at 7.

[57] *See, e.g.,* Faeth Dep. – ECF No. 94-15 at 6 (p. 25:6–13).

[58] Hughes Dep. – ECF No. 111 at 24 (pp. 83:21–85:9, 85:13–20), 48 (p. 179:14–22).

[59] *Id.* at 32 (p. 115:1–11), 48 (p. 179:14–22).

[60] *Id.* at 25 (p. 87:1–15), 32 (p. 115:8–9), 33 (p. 120:2–19); Google Image – ECF No. 94-8 at 30 (Officer Hughes marked location); Scene Diagram, Ex. A to Chavez Decl. – ECF No. 94-20 at 2 (location of officers' vehicles and Mr. Perkins's body); OPD Administrative Report – ECF No. 102-7 at 50 (officers' locations).

[61] Hughes Dep. – ECF No. 111 at 46–47 (pp. 173:25–175:6) (describing pistol as iconic); Hughes Decl. – ECF No. 94-24 at 4 (¶ 10).

[62] Hughes Dep. – ECF No. 111 at 25 (p. 87:16–24). "Code 7" means someone has a gun or weapon but doesn't convey what the person is doing with the weapon. *Id.* (p. 88:1–10).

Officer Hughes pulled out his gun and moved north (toward Mr. Perkins) to try to take cover behind a vehicle and to put himself between Mr. Perkins and the other officers because some officers had their backs to Mr. Perkins.[63] Mr. Perkins continued to walk south toward the officers.[64] Sergeant Turner "jumped up kind of on the sidewalk in front of" Mr. Perkins, who "had been carrying the gun . . . kind of behind him."[65] "As Sergeant Turner turned in front" of Mr. Perkins, Officer Hughes saw the gun "go from behind" Mr. Perkins's "thigh where it was covered, blocked by a body, to more of this position, angled position in front of his body . . . ."[66] Mr. Perkins was looking "straight in front of him" toward Sergeant Turner.[67] The gun was "oriented at that angle we talked about towards the ground, not completely up," at about a 45-degree angle from the ground.[68]

At that point, Mr. Perkins was about 15 feet away, and Officer Hughes fired two rounds at him because he thought Mr. Perkins was going to shoot Sergeant Turner.[69] He thought that the first shot missed Mr. Perkins because Mr. Perkins "kept moving south towards Joe [Sergeant Turner]. He didn't drop the gun."[70] He thought the second shot hit Mr. Perkins because "he twitched and his torso kind of opened up towards me, so I thought I got him, I hit him, that was a good hit."[71] Officer Hughes stopped to "assess[] for a second" to see whether Mr. Perkins would fall, drop the gun, or run, but Mr. Perkins continued to walk toward Sergeant Turner.[72] Officer Hughes thought that Mr.

---

[63] *Id.* (pp. 88:11–89:11), 30 (p. 109:2–5).

[64] *Id.* at 25 (p. 89:15), 30 (p. 109:5–6).

[65] *Id.* at 25 (p. 89:15–20).

[66] *Id.* (p. 89:21–22), 30 (p. 109:14–19), 47 (p. 176:21–24), 48 (p. 178:9–17).

[67] Hughes Internal Affairs ("IA") Interview – ECF No. 123 at 8 (p. 7:11–13).

[68] Hughes Dep. – ECF No. 111 at 48 (p. 178:9–17), 35 (p. 129:4–12); Hughes IA Interview – ECF No. 123 at 7–8 (pp. 6:24–7:3), 39 (p. 38:11–21) (characterizing it as a natural walking motion, at his side, "not necessarily in a low ready").

[69] Hughes Dep. – ECF No. 111 at 30 (p. 109:10–24), 33 (p. 121:24–25), 48 (pp. 179:2–12, 181:12–21); Hughes IA Interview – ECF No. 123 at 8 (p. 7:8–17).

[70] Hughes Dep. – ECF No. 111 at 30–31 (pp. 109:14–110:1).

[71] *Id.* at 31 (p. 110:2–5).

[72] *Id.* (p. 110:5–11).

Perkins "had picked" Sergeant Turner and was "going after" him, so he fired again.[73] He stopped when he saw Mr. Perkins fall, about 30 feet from where Mr. Perkins pulled the gun initially.[74] As Mr. Perkins fell, the gun fell out of his hand and landed "a ways away from him."[75] Officer Hughes did not have time to issue a warning to Mr. Perkins because of the immediate threat he posed to the officers.[76]

### 1.2  Officer Jonathan Cairo's Account

During the debriefing, Officer Cairo heard the Code 7 warning, looked north, and saw Mr. Perkins "walking southbound on the west sidewalk" holding a "large handgun" in his right hand, with a long barrel.[77] "It was pointed down at the ground but in front of his leg, so forward down in front of his leg, but still down in a downward stretch."[78] He looked for cover and lost sight of Mr. Perkins, and when he saw him again, Mr. Perkins was moving closer and was raising his right hand (with the gun in it) towards the officers.[79] "[T]he gun was coming up," but Officer Cairo couldn't remember "the exact [angle] — if it was 90 or — I can't tell you that. I don't remember."[80] Officer Cairo fired twice because he thought Mr. Perkins was going to shoot them.[81] He saw Mr. Perkins fall but did not see where the gun went.[82]

---

[73] *Id.* (p. 110:12–16).

[74] *Id.* (p. 110:15–17); Hughes Decl. – ECF No. 94-23 at 4–5 (¶ 16).

[75] Hughes Dep. – ECF No. 111 at 31 (p. 110:17–19).

[76] Hughes IA Interview – ECF No. 123 at 30 (p. 29:11–16); Hughes Decl. – ECF No. 94-24 at 5 (¶ 17) (didn't remember giving a warning but didn't have time to do so).

[77] Cairo Dep. – ECF No. 119 at 24 (pp. 82:4–84:11); Cairo IA Interview – ECF No. 125 at 13 (p. 12:11–12), 17 (p. 16:3–15) (gun was aimed down, but as Mr. Perkins turned to the left, "it looked almost like he was raising it . . . . [I]t wasn't exactly pointed off the ground, but . . . I'm not sure . . . .").

[78] Cairo Dep. – ECF No. 119 at 24 (p. 84:9–11).

[79] *Id.* at 25 (pp. 88:12–90:22), 28 (p. 100:18–23).

[80] *Id.* at 26 (pp. 90:19–91:5).

[81] *Id.* (p. 91:6–9); Cairo IA Interview – ECF No. 125 at 13 (p. 12:11–12).

[82] Cairo Dep. – ECF No. 119 at 30 (p. 108:18–24).

### 1.3 Officer Joshua Barnard's Account

During the debriefing, Officer Barnard thought he heard Officer Hughes (who was standing next to him) say, "Drop the gun. Drop the gun."[83] Officer Barnard looked north, where Officer Hughes faced, and saw that Officer Hughes had drawn his firearm.[84] He saw Mr. Perkins walking toward them, holding a firearm in his right hand, which was "at his side slightly positioned behind him by his back."[85] Officer Barnard began to "side-step" to his right, drew his firearm, and pointed it at Mr. Perkins.[86] Mr. Perkins "raise[d] the gun up from the initial position . . . to an upward position," and it was "pointed in a forward direction . . . higher" than 45 degrees.[87] From his position, Officer Barnard could not tell whether Mr. Perkins "was specifically pointing [his gun] at anyone."[88] Officer Barnard then fired four shots at Mr. Perkins because he "felt that [Mr. Perkins] was potentially going to shoot [him] or the other officers."[89] After he was shot, Mr. Perkins "twist[ed], almost [at] a 180 motion" and fell onto his back.[90] Officer Barnard did not shoot after Mr. Perkins fell.[91]

### 1.4 Sergeant Joseph Turner's Account

During the debriefing, Sergeant Turner heard Officer Hughes say "Code 7" while moving in front of him, and Sergeant Turner turned in that direction.[92] He saw Mr. Perkins walking toward the officers, with his arms moving "with his walking motion," with a "large, black handgun" in his right

---

[83] Barnard Dep. – ECF No. 120 at 17 (p. 56:4–25) (he did not hear "Code 7"); Barnard IA Interview – ECF No. 126 at 36 (p. 35:4–8) (did not hear anyone else give commands).

[84] Barnard Dep. – ECF No. 120 at 18 (p. 59:13–20), 32 (p. 114:7–23).

[85] *Id.* at 18 (pp. 59:18–60:6).

[86] *Id.* at 19 (p. 65:9–22).

[87] *Id.* at 20 (pp. 67:8–10, 68:17–21), 22 (p. 77:11–24).

[88] *Id.* at 20 (p. 67:15–19).

[89] *Id.* at 20 (pp. 67:11–14, 69:11–19).

[90] *Id.* at 21 (pp. 71:23–72:13).

[91] *Id.* at 22 (p. 75:2–4).

[92] Turner Dep. – ECF No. 121 at 27 (p. 97:1–14), 28 (p. 98:2–6).

hand, "pointed downwards."[93] Sergeant Turner drew his weapon and moved a short distance to his left (west) toward the gas station.[94] He heard (whom he believed to be) Officer Hughes tell Mr. Perkins to "get down on the ground," and he waited to see whether Mr. Perkins would obey the command.[95] Mr. Perkins then moved the gun from a position "angled towards the ground . . . to up into the center mass of his body," pointing toward the officers.[96] As Mr. Perkins raised the gun, Sergeant Turner lost sight of the gun because Mr. Perkins was backlit, and the gun disappeared into the "dark mass of [Mr. Perkins's] center mass area."[97] Sergeant Turner then heard several gunshots, saw that Mr. Perkins was still standing and pointing the gun at the officers, and shot at Mr. Perkins because he thought Mr. Perkins was going to shoot them.[98] He did not see the gun again before he began shooting.[99] He did not warn him before shooting.[100] He did not recall seeing Mr. Perkins fall or drop his gun.[101]

### 1.5 Officer Cullen Faeth's Account

Officer Faeth (who worked and socialized with Officer Hughes and thus recognized his voice) heard "Code 7," thought it was Officer Hughes, thought Officer Hughes yelled "something like, 'He's got a gun,'" and heard other commands but didn't recall exactly what they were.[102] He saw Mr. Perkins walking south toward the officers and (in his deposition) said that he did not see anything in Mr. Perkins's hands because Officer Hughes blocked his view.[103] The plaintiffs'

---

[93] *Id.* at 28 (pp. 98:10–99:3, 99:19–100:5).

[94] *Id.* at 28–29 (pp. 100:19–102:16) (moved the equivalent of one large step).

[95] *Id.* at 31 (pp. 111:24–112:9).

[96] *Id.* (pp. 110:20–111:1), 33–34 (pp. 121:20–122:12).

[97] *Id.* at 31 (p. 111:2–11).

[98] *Id.* (p. 112:14–19), 40 (p. 146:4–10) (was standing "straight up"); *cf. id.* at 41 (pp. 151:7–152:18) (Sergeant Turner did not recall shooting Mr. Perkins when he was on the ground).

[99] *Id.* at 34–35 (pp. 125:13–126:4), 38 (p. 140:1–10).

[100] *Id.* at 43–44 (pp. 161:19–162:24).

[101] *Id.* at 44 (p. 163:17–20), 45 (p. 166:6–18).

[102] Faeth Dep. – ECF No. 94-15 at 3–4 (p. 19:6–20:14).

[103] *Id.* at 5–6 (pp. 24:24–25:4).

counsel played the body-camera recording of Officer Faeth's statements that Mr. Perkins "reached" and (in response to Officer Hughes's statement that "he had it out") "I just saw his hand on it."[104] Officer Faeth acknowledged that he told Officer Hughes that he "just saw his hand on it" but said that he did not remember "sit[ting] here today" whether he saw a gun in Mr. Perkins's hand.[105]

### 1.6  Other Officers' Accounts

Officer Bryan Budgin heard "Code 7" and saw Mr. Perkins with "a large, black, semiautomatic handgun" in his right hand "down at the side slightly forward as he came into view."[106] He saw the muzzle of the gun move "slightly forward and up" to approximately 45 degrees.[107] Mr. Perkins then "crossed into a plane where Officer Hughes was in front of me towards the right. At around that time, I heard 'Drop it, show me your hand,' . . . followed by two gunshots."[108] He believed that he pointed his gun at Mr. Perkins.[109]

Officer Marco Noriega heard Officer Hughes say, "Code 7 gun," thought he heard someone say something along the lines of "[p]olice, don't move," and looked up.[110] He saw Mr. Perkins walking south (toward the police) with a firearm in his right hand, down near his right thigh, next to his right buttock, "swinging the gun as someone does when walking," in the low-ready position, "kind of trying maybe to conceal, I guess, or hide" it.[111] He heard officers say, "Put it down" and

---

[104] Faeth Dep. – ECF No. 117 at 10–11 (pp. 29:8–30:10); *see* Transcript of Body Camera Recording, Ex. F to Sorensen Decl. – ECF No. 116 at 7.

[105] Faeth Dep. – ECF No. 117 at 11 (pp. 30:12–31:22).

[106] *Perkins* Budgin Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 147 (p. 19:21–25), 148 (p. 21:7–9), 151 (p. 24:19–21).

[107] *Id.* at 152 (p. 25:1–5).

[108] Id. at 149 (p. 22:21–25).

[109] *Id.* at 155 (p. 30:4–12).

[110] *Perkins* Noriega Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 175–176 (pp. 16:19–17:4).

[111] *Id.* at 176 (p. 17:4–14), 177 (p. 20:7–14); Noriega Dep. – ECF No. 94–13 at 4–5 (pp. 18:6–19:5); Noriega IA Interview – ECF No. 127 at 6 (p. 5).

"[s]omething along the lines of 'get down,' but I don't remember."[112] Mr. Perkins did not respond.[113]

Officer Robert Blakeley heard an officer say "Code 7," saw an officer move through the circle of police officers in a "northwestern direction," looked in that direction, and unholstered his firearm.[114] He then saw Mr. Perkins walking toward the officers, carrying a "very large firearm in his [right] hand."[115] "His right arm appeared to be at a 45-degree angle in the front of his body," not at shoulder height but "down closer to his leg."[116] The position was "similar to what would be a low-ready position" but it was "not what we would consider a low-ready position. [A] [l]ow-ready position would be like two hands on the firearm at a position ready to fire."[117] When asked whether he heard any officer "shout a warning" before shots were fired, Officer Blakely said that he heard shouting that he believed were commands but did not remember specific words.[118] He saw Mr. Perkins raise the gun to "almost parallel" before he heard any shots fired.[119] He did not fire at Mr. Perkins because he did not have a clear shot.[120]

Officer Nicolas Petersen heard "Code 7" and officers "verbally challeng[ing]" Mr. Perkins, but did not remember "what words were used."[121] Mr. Perkins had a "large firearm in his right hand . . .

---

[112] Noriega Dep. – ECF No. 94-13 at 6–7 (pp. 23:19–24:3).

[113] *Id.* at 7 (p. 24:4–6).

[114] Blakely Dep. – ECF No. 94-10 at 3 (p. 31:2–13), 4 (p. 33:20–25).

[115] *Id.* at 5–6 (pp. 34:23–35:2), 9–10 (pp. 38:6–39:3).

[116] *Id.* at 7–8 (pp. 36:13—37:9).

[117] *Id.* at 8–10 (pp. 37:12–39:8).

[118] *Id.* at 11 (p. 70:14–18); *Perkins* Blakely Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 138 (p. 58:1–13).

[119] Blakely Decl. – ECF No. 94-18 at 3 (¶ 7).

[120] *Id.* (¶¶ 6–7).

[121] Petersen Dep. – ECF No. 94-12 at 7 (p. 29:14–18); *Perkins* Peterson Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 190 (p. 23:1–7).

[t]o the right side of his body."[122] He saw Mr. Perkins "raise the gun . . . forward of his right leg and coming forward."[123]

Officer Uriel Martinez Contreras was sitting in his patrol car and saw Mr. Perkins walking south toward the officers.[124] Mr. Perkins passed the patrol car, turned to look at Officer Martinez Contreras, and looked "normal."[125] A minute later, Officer Martinez Contreras heard a single shot, got out of his car, saw Mr. Perkins standing, and at that moment, did not see Mr. Perkins with a gun because it was not possible from his vantage point.[126] He thought he heard Sergeant Turner say, "Drop it," and believed that he observed Sergeant Turner firing four or five shots.[127] He then saw Mr. Perkins turn to his right with a large semi-automatic weapon in his right hand, about chest height.[128] He then saw the gun drop to the ground.[129]

Officer Vanessa Kelley heard "Code 7."[130] A second or two before the first shots were fired, she also heard "Put it down. Put the gun down."[131] She saw Mr. Perkins, could not see below his neck, and did not see his hands or whether he had anything in them.[132]

## 2. Civilian Eyewitness Christopher Wise's Account

One civilian eyewitness — Christopher Wise, who had known Mr. Perkins for four years — witnessed the shooting from outside of his then-home, Hampton Transitional Housing, across the

---

[122] *Perkins* Peterson Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 186–187 (pp. 17:21–18:10).

[123] *Id.* at 187 (p. 18:11–15).

[124] *Perkins* Martinez Contreras Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 160 (p. 14:14–18), 161–162 (pp. 15:25–16:3).

[125] *Id.* at 162 (p. 16:4–9), 168 (p. 24:1–23).

[126] *Id.* at 162–64 (pp. 16:4–18:8).

[127] *Id.* at 162–63 (pp. 16:25–17:25).

[128] *Id.* at 169 (p. 27:1–8).

[129] *Id.* (p. 27:11–12).

[130] Kelley Dep. – ECF No. 94-14 at 4 (p. 14:6–8).

[131] *Id.* at 6 (p. 26:15–18); *Perkins* Kelley Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 195 (p. 17:7–18) (did not hear "If you don't put the gun down, I will sho[o]t you.").

[132] Kelley Dep. – ECF No. 94-14 at 5 (p. 15:10–14), 6 (p. 26:19–23).

street from the gas station.[133] He gave the following information to the police in a recorded statement.

Right before the shooting, he saw police cars and the officers standing on the sidewalk.[134] He saw Mr. Perkins "on the side by the pumps . . . [for] air and water."[135] He watched Mr. Perkins walk up to the group of officers "semi-aggressive cuz he was moving hella fa- like fast like . . . [s]tomping his feet, you know."[136] Mr. Perkins was "irritated," but he "didn't pull the gun out. The gun was in his waist band."[137] Mr. Perkins "lift[ed] his shirt up like . . . to . . . show 'em the firearm. Like, he was kinda like surrendering, like not aiming, like grabbing for it . . . ."[138] The officers yelled, "Gun – Gun – Gun."[139] He then heard multiple shots — what "sounded like maybe a ten clip" — and saw Mr. Perkins fall to the ground.[140]

The parties have been unable to locate Mr. Wise and thus did not depose him or obtain a declaration from him.[141]

---

[133] Wise Video and Transcript, Ex. E to Sorensen Decl. – ECF Nos. 114 (pp. 7–10), 115; Wise Transcript, Ex. C to Loebs Supp. Decl. – ECF No. 129-2 at 12 (p. 5:7–11), 13–15 (pp. 6:4–15:21).

[134] Wise Transcript, Ex. C to Loebs Supp. Decl. – ECF No. 129-2 at 19–20 (pp. 12:5–13:13).

[135] *Id.* at 16 (p. 9:1–11), 25 (p. 18:18) (standing by the pumps). The video shows Mr. Perkins falling to the ground on the west sidewalk on 90th avenue, about 70 feet from the nearest pump. Camera 2 Video, Ex. A to Loeb Decl. – ECF No. 94-2; Scene Diagram, Ex. A to Chavez Decl. – ECF No. 94-20 at 2.

[136] Wise Transcript, Ex. C to Loebs Supp. Decl. – ECF No. 129-2 at 26–27 (pp. 19:17–20:1).

[137] *Id.* at 27 (p. 20:3–4).

[138] *Id.* at 11–12 (pp. 4:12–5:2).

[139] *Id.* at 23 (p. 16:18–22).

[140] *Id.* at 12 (p. 5:2–3), 28 (p. 21:2–3).

[141] Loebs Supp. Decl. – ECF No. 129-1 at 3 (¶ 4). Mr. Wise's statement is inadmissible hearsay. The court can consider it at summary judgment if the underlying evidence "could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003)); *see Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991). Given the plaintiffs' reliance on the Wise statement, the court will not rule as a matter of law that Mr. Wise will not be available at trial and so considers the statement to determine whether there is a dispute of fact that precludes summary judgment. Reply – ECF No. 129 at 13–14 n.7 (arguing that Mr. Wise will not be available). At trial, if Mr. Wise is not available, then any disputes of fact that depend solely on his hearsay statement are no longer disputes because his statement is inadmissible.

### 3. Other Evidence

John J. Ryan, the plaintiffs' police-practices expert, also analyzed the gas-station videos. He said:

> [I]t appeared to me that Perkins['s] arms were down at this side until about the time the shooting occurred when his arm is [sic] went up over his shoulder. I saw no movement in the video consistent with Perkins, in any way moving his body as if presenting a weapon in the low-ready position or the pointing position.[142]

Among other things, Mr. Ryan opined that an officer's denial of being able to see events — such as Officer Faeth's disavowal of seeing the gun — is one of the red flags for the cone of silence.[143] He opined that some officers' disavowal of their initial statements in favor of new positions was evidence of after-the-fact justification of the shooting.[144] The record suggested collaboration by the officers to present a version of events to cast Mr. Perkins as an immediate threat.[145] If there was time to give a warning to "get on the ground," there was time to give a warning.[146] He said that if the "various versions offered by the involved officers were accepted as true [—] specifically that Mr. Perkins[,] while in possession of the replica firearm, began raising the gun toward officers or completely raised the gun toward officers while approaching the officers on the sidewalk [—] then the use of deadly force would be consistent with generally accepted policies, practices, training, and legal mandates trained to law enforcement officers."[147]

The coroner's autopsy report shows the following (among other things) about the wounds. Bullet wounds 2 and 3 are front to back, "superior to inferior," meaning, from top to bottom, with wound 2 at a 40-degree angle and wound 3 at a 30-degree angle.[148] Brian

---

[142] Ryan Report – ECF No. 113 at 75 (¶ 169).

[143] Id. at 55 (¶ 123), 81 (¶ 183).

[144] Id. at 80–81 (¶ 181).

[145] Id.

[146] Id. at 80 (¶ 180).

[147] Id. at 74 (¶ 166).

[148] Coroner's Autopsy Report – ECF No. 118 at 16–17 (pp. 15:284–16:304).

Peterson, a pathologist, opined that — based on the wound angles — wounds 2, 3, 4, 5, 8, 9, and 10 "were sustained with Mr. Perkins supine and rolling to his left."[149] Wounds 6, 7, 13, and 14 "were sustained while Mr. Perkins was upright," and wound 1 "was delivered about the same time, and likely just before. . . " and caused the immediate 'drop and roll' visible in the video; Mr. Perkins was deceased at this point."[150] Wounds 11, 12, and 15 "are indeterminate as to body position."[151] Morphine and methamphetamine "were present at toxic levels."[152]

Police officers testified that Mr. Perkins was not a threat when he was on the ground.[153]

The defendants' expert Kris Mohandie, a psychologist, opined that even if the officers fired some shots when Mr. Perkins was falling or on the ground, the timing of the shots (12 in the last two seconds) is consistent with the expected perception-reaction lag time, given how fast the events unfolded.[154] Once the officers decide to shoot, it takes some time to stop after the officers perceive the threat is extinguished, especially in stressful circumstances.[155] Dr. Mohandie also opined that Mr. Perkins's death was "suicide by cop."[156]

Mr. Ryan, the plaintiffs' expert, disagreed that the reactionary gap existed based on the physics of the shots here.[157] The reactionary-gap studies explain why an officer who fires at a suspect's front actually hit the suspect's back: that result happens because a suspect can

---

[149] Peterson Report – ECF No. 102-24 at 7 (¶ 2).

[150] *Id.* (¶¶ 1, 3).

[151] *Id.* (¶ 4).

[152] *Id.* (¶ 6).

[153] *See, e.g.,* Hughes Dep. – ECF No. 111 at 35 (p. 126:16–18); Cairo Dep. – ECF No. 119 at 30 (p. 109:15–18); Barnard Dep. – ECF No. 120 at 22 (p. 76:22–25).

[154] Mohandie Report – ECF No. 94-30 at 15–18 (pp. 14–17).

[155] *Id.*

[156] *Id.* at 7–14 (pp. 8–13).

[157] Ryan Report – ECF No. 113 at 78 (¶ 176).

spin that fast.[158] But here, an officer who fires a bullet at a standing person (who falls to the ground from a previous shot) misses the person entirely.[159]

Elizabeth Smith Allen, Mr. Perkins's relative by marriage, and Sharon Bershell, his former girlfriend, testified that on several occasions, they witnessed Mr. Perkins threatening people with a gun.[160]

### 4. Other Procedural History

There are two lawsuits: (1) the *T.D.P.* lawsuit filed by Mr. Perkins's minor daughter T.D.P. (through her mother), and (2) the *Perkins* lawsuit filed by Mr. Perkins's mother Ada-Perkins Henderson and his adult son Richard Perkins III.

The *T.D.P.* complaint has the following claims brought by T.D.P. individually and as her father's successor in interest: (1) a violation of 42 U.S.C. § 1983 based on (a) an unreasonable search and seizure in violation of the Fourth Amendment, (b) excessive and unreasonable force during a seizure in violation of the Fourth Amendment, and (c) interference with the familial relationship in violation of the First and Fourteenth Amendments (against the four officers who shot Mr. Perkins); (2) a *Monell* claim (against the City of Oakland and former police chief Sean Whent); (3) a violation of California's Bane Act, Cal. Civ. Code § 52.1 (against all defendants on the same theories as claim one); (4) negligence (against all defendants based on excessive-force and failure-to-train-and-supervise theories); and (5) battery (against the four police officers and the City of Oakland).[161] The *Perkins* complaint has the following claims: (1) excessive force in violation of the Fourth Amendment (brought by Richard Perkins as his father's successor-in-interest against the four officers who shot Mr. Perkins); (2) a violation of the parental right to a familial relationship in violation of the Fourteenth Amendment (brought by Ms. Perkins-Henderson against the four

---

[158] *Id.*

[159] *Id.* at 78–79 (¶ 176).

[160] Smith-Allen Dep. – ECF No. 94-17 at 8 (p. 42:18–20), 10 (p. 44:9–17), 14 (p. 48:14–18), 15–17 (pp. 53:23–55:22); Bershell Dep. – ECF No. 94-16 at 3 (p. 23:7–14), 4–5 (pp. 24:17–25:11), 6–9 (pp. 26:8–29:6).

[161] *T.D.P.* Compl., No. 3:16-cv-04132-LB – ECF No. 1 at 8–16 (¶¶ 31–57).

officers); (3) a violation of the child's right to a familial relationship in violation of the Fourteenth Amendment (brought by Richard Perkins III against the four officers); (4) a *Monell* claim (brought by Richard Perkins III as his father's successor-in-interest against the City of Oakland; (5) a violation of California's Bane Act, Cal. Civ. Code § 52.1 (brought by Richard Perkins III as his father's successor-in-interest against all defendants); (6) battery (brought by Richard Perkins III as his father's successor-in-interest against all defendants); (7) negligence (brought by Richard Perkins III as his father's successor-in-interest against all defendants); and (8) wrongful death (brought by Richard Perkins III as his father's successor-in-interest against all defendants).[162] The defendants moved for summary judgment on all claims.[163] The court held a hearing on January 24, 2019.[164]

## SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*,

---

[162] *Perkins* Compl., No. 3:16-cv-04324-LB – ECF No. 1 at 4–9 (¶¶ 23–47).

[163] *T.D.P.* Mot. for Summary Judgment, No. 3:16-cv-04132-LB – ECF No. 94; *Perkins* Mot. for Summary Judgment, No. 3:16-cv-04324-LB – ECF No. 75.

[164] Minute Entry – ECF No. 151.

*Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the non-moving party and draws all factual inferences in the non-moving party's favor. *E.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

# ANALYSIS

The defendants move for summary judgment on the following grounds: (1) the use of force was reasonable under the Fourth Amendment, and in any event, they are entitled to qualified immunity; (2) their actions did not violate the Fourteenth Amendment because they acted with a legitimate law-enforcement objective, and they are entitled to qualified immunity; (3) there is no evidence of any unconstitutional municipal custom, practice, or policy to support the plaintiffs' *Monell* and supervisory-liability claims; and (4) the state claims fail because the officers' use of force was reasonable.[165] The court grants in part and denies in part the summary-judgment motion: (1) the court denies the motion on the Fourth Amendment excessive-force claim because eyewitness

---

[165] Mot. – ECF No. 94 at 21–34.

Christopher Wise's account creates a genuine dispute of material fact (but if he is not a trial witness, then the officers are entitled to qualified immunity); (2) the court grants the motion on the Fourteenth Amendment claim; (3) the court grants the motion on the *Monell* and supervisory-liability claims; and (3) the court denies the motion on the state-law claims.

### 1. Excessive Force — Fourth Amendment — 42 U.S.C. § 1983

The four officers who shot Mr. Perkins move for summary judgment on the excessive-force claim on the grounds that their use of force was reasonable and they are entitled to qualified immunity. Because witnesses disagree about whether Mr. Perkins had the pellet gun out or whether it was in his waistband, the court cannot decide as a matter of law whether the use of force was reasonable or whether the officers have qualified immunity. The court thus denies the defendants' motion for summary judgment on the Fourth Amendment claim. There is a caveat to this denial: without eyewitness Christopher Wise's account, the officers would be entitled to qualified immunity because no controlling precedent establishes a Fourth Amendment violation for officers acting under similar circumstances.

#### 1.1 Governing Law

##### 1.1.1 Excessive Force[166]

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989) (citations and internal quotation marks omitted). A court must evaluate "the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted). The *Graham* factors are not exhaustive. *George v.*

---

[166] The parties do not dispute that the officers acted under color of state law or that by shooting Mr. Perkins, they seized him within the meaning of the Fourth Amendment.

*Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc), courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*[,]'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted). Other factors relevant to the analysis include the availability of less intrusive alternatives to the force used and giving proper warnings before using force, if feasible. *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)); *see id.* at 396 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment.") (citations omitted). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has held that "summary judgment . . . in excessive force cases should be granted sparingly." *Glenn*, 673 F.3d at 871 (quotations and citations omitted). "This principle applies with particular force where the only witness other than the officers was killed during the encounter." *Gonzales v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc). The Ninth Circuit has said: "We are mindful that cases in which the victim of alleged excessive force has died 'pose a particularly difficult problem' in assessing whether the police acted reasonably, because 'the witness most likely to contradict [the officers'] story . . . is unable to testify.'" *Gregory v. Cty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994) ("[T]he court may not simply accept what may be a self-serving account by the police officer.")). "In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before

a shooting has died, [Ninth Circuit] precedent permits the decedent's version of events to be constructed circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement." *George*, 736 F.3d at 834 (citations omitted). "Accordingly, [the court must] carefully examine 'all the evidence in the record, such as medical reports, contemporaneous statements by the officer[s] and the available physical evidence, . . . to determine whether the officer[s'] story is internally consistent and consistent with other known facts.'" *Gonzales*, 747 F.3d at 795 (quoting *Scott*, 39 F.3d at 915). The court "must also examine 'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Id.*

### 1.1.2 Qualified Immunity

"'[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos*, 661 F.3d at 440 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (emphasis in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Under qualified immunity, an officer will be protected from suit when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Id.* at 1866 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 1867.

In determining whether an officer is entitled to qualified immunity, courts consider (1) whether the officer violated a constitutional right of the plaintiff, and (2) whether that constitutional right was "clearly established in light of the specific content of the case" at the time of the events in question. *Mattos*, 661 F.3d at 440 (citation omitted). Courts may exercise their sound discretion in deciding which of these two prongs should be addressed first. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Regarding the second prong, the Supreme Court has cautioned that "'clearly established law' should not be defined 'at a high level of generality'" but instead "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted). The Supreme Court has held that "[a]lthough [its] case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citing *White*, 137 S. Ct. at 551). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).

### 1.2 Analysis

The parties do not dispute that Mr. Perkins walked down the sidewalk, toward eleven uniformed officers and their five patrol cars. They dispute whether his pellet gun was in his hand or whether he merely lifted his shirt to show the officers that the gun was in his waistband. If Mr. Perkins had the gun in his hand — as the officers generally reported[167] — the officers' use of force might be

---

[167] Hughes Dep. – ECF No. 111 at 35 (p. 129:4–12), 48 (pp. 178:9–179:12) (gun was pointed at ground; Mr. Perkins raised it to about a 45-degree angle); Cairo Dep. – ECF No. 119 at 25–26 (pp. 88:12–91:9) (Mr. Perkins was raising the gun); Barnard Dep. – ECF No. 120 at 18 (pp. 59:23–60:6), 20 (pp. 67:3–10, 68:17–21) (Mr. Perkins began to raise the gun); Turner Dep. – ECF No. 121 at 31 (pp. 110:20–112:19), 33–34 (pp. 121:20–122:12) (Mr. Perkins moved the gun from a position "angled toward the ground" up to "the center mass of his body); *Perkins* Budgin Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 151–52 (pp. 24:19–25:5) (first saw the gun in Mr. Perkins's right hand, down at his side and slightly forward, and then saw the muzzle move slightly forward and up to about 45 degrees); Noriega Dep. – ECF No. 94-13 at 4–5 (pp. 18:6–19:9) (gun was in the low-ready position); Blakely Decl. – ECF No. 94–18 at 3 (¶ 7) (gun was at 45-degree angle); *Perkins* Petersen Dep., No. 3:16-cv-04324-LB – ECF No. 91-1 at 187 (p. 18:11–15) (gun was "forward of [Mr. Perkins's] right leg and coming forward"); *Perkins*

reasonable, and they in any event would be entitled to qualified immunity because no controlling precedent establishes a Fourth Amendment violation for officers acting under similar circumstances. But if Mr. Perkins lifted his shirt to reveal the gun, as eyewitness Christopher Wise reports, a reasonable jury could find a Fourth Amendment violation on the ground that he posed no immediate threat. This dispute of fact precludes summary judgment.

An officer may use deadly force if he has "probable cause to believe that the suspect poses a threat of serious harm, either to the officers or to others[.]" *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). When someone points a gun at an officer, the "Constitution undoubtedly entitles the officer to respond with deadly force." *George*, 736 F.3d at 838. But in the plaintiffs' scenario, even with Mr. Perkins's erratic behavior (in the form of advancing on the police officers), "if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him . . . ." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014). If Mr. Perkins only lifted his shirt to show the gun in his waistband, then a reasonable jury could find that he did not pose an immediate threat and that in any event, a warning was feasible. *See, e.g.*, *George*, 736 F.3d at 832–33, 838–39.

The defendants nonetheless argue that the court can disregard Mr. Wise's testimony because it is inconsistent with the video evidence, particularly his demonstration of how Mr. Perkins raised his shirt high over his chest.[168] That argument fails for two reasons.

First, the videos do not show what Mr. Perkins did before he entered the cameras' views. The Camera 10 video shows Mr. Perkins and the police, but Mr. Perkins is visible only as he falls to the ground, after he was shot.[169] The Camera 2 video shows Mr. Perkins only .03 milliseconds before he begins to fall.[170] Both videos are incomplete accounts because events between frames (separated

---

Martinez Contreras Dep., No. 3:16-cv-04324-LB – ECF No. 191-1 at 169 (p. 27:1–8) (gun was at chest height).

[168] Reply – ECF No. 129 at 14

[169] Camera 10 Video, Ex. B to Loebs Decl. – ECF Nos. 94-3.

[170] Camera 2 Video, Ex. A to Loebs Decl. – ECF No. 94-2; Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 14 (image-examination PDF, slides 13 to 56), 15 (description of images).

in time by 100 milliseconds for Camera 10 and 143 milliseconds for Camera 2) are not recorded.[171] The gun can be seen for the first time only in midair.[172] A reasonable jury could conclude based on Mr. Wise's account that Mr. Perkins only lifted his shirt to show the gun and that the shots caused the gun to dislodge from his waistband.

Second, any inconsistency does not render Mr. Wise necessarily a liar. The police interviewed him ninth months after the shooting.[173] Memory can change. Witness accounts can vary. Indeed, the officers' accounts are inconsistent too. For example, some officers reported hearing warnings before shots were filed, but no officer reported giving a warning.[174] Another example is that the officers' accounts varied about the gun position and other details.[175] This is normal and is not grounds to discount testimony entirely. Instead, it goes to the weight that a jury gives the evidence:

> Sometimes a witness may something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

9th Cir. Model Jury Instr. 1.14, Credibility of Witnesses.

Without Christopher Wise's eyewitness account, the result is different. Whether Mr. Perkins pointed the gun at the officers, had the gun in his hand at around 45 degrees in a walking motion (or in the low-ready position) and did not point, or put his hand on the gun (as an apparent precursor to pulling it out), he posed an immediate risk of harm. *George*, 736 F.3d at 838 (if a person is armed, or reasonably suspected to be armed, "a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat"). And given the serious-looking gun in Mr. Perkins's hand, the officers had split seconds to draw their guns, move to cover positions, and fire.

---

[171] Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 17.

[172] *Id.* at 16.

[173] Wise Transcript, Ex. C to Loebs Supp. Decl. – ECF No. 129-2 at 8 (August 24, 2016 interview).

[174] *See supra* Statement (summarizing the officers' accounts).

[175] *See supra* Statement; *T.D.P.* Opp., No. 3:16-cv-04132-LB – ECF No. 102–3 at 16–18 (pointing out discrepancies).

The plaintiffs argue that merely being armed does not justify force.[176] *George v. Morris* and other cases establish the point that a weapon may not pose an immediate threat. *See, e.g.*, *id.* at 832–33, 838–39 (reasonable jury could find a Fourth Amendment violation if the officers "indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground"); *Glenn*, 673 F.3d at 873–78 (no immediate threat in a 911 scenario without flight or an alleged crime when the officers shot a person holding, but not brandishing, a pocket knife); *Curnow*, 952 F.2d at 323, 325 (according to the plaintiff's version of the facts, the decedent had a gun but was not pointing it at the officers or facing them when they shot him).

These cases involve scenarios where the threat is not immediate and warnings are feasible. By contrast, here, an armed man advanced on a group of uniformed police officers next to their patrol cars, with emergency lights flashing, near a brightly lit gas station, at nightfall. The perceived risk was immediate. That immediacy distinguishes this case from *Lopez v. Gelhaus*, where a reasonable jury could conclude that the police shot a teenager, who was openly carrying a toy AK-47 during the day, pointed at the ground, as he moved away from the officer, in a park. *Lopez v. Gelhaus*, 871 F.3d 998, 1006–13 (9th Cir. 2017). That scenario allowed for other options (such as a warning) before the use of deadly force. *Id.* at 1002–03, 1007–08 (a reasonable jury could find a Fourth Amendment violation based on the shooting of a teenager based on, among other facts, the teenager's open carrying of a toy AK-47 pointed at the ground in an open park with no other people around, the possibility based on other confiscations that it was a toy, the officer's giving a warning from 65 feet away to "drop the gun," the teenager's "natural" reaction in turning around and not knowing until then that the "warner" was a police officer, and the availability of other options such as giving a warning about the use of deadly force); *accord Curnow*, 952 F.2d at 325.

Mr. Perkins's threatening behavior (reaching for or pointing a gun) is more like the hypothetical scenario in *Cruz*, 765 F.3d at 1078. In *Cruz*, a confidential informant told the police (among other things) that Cruz — a known parolee with a prior felony firearms conviction — was a gang

---

[176] *T.D.P.* Opp., No. 3:16-cv-04132-LB – ECF No 110 at 21; *Perkins* Opp., No. 3:16-cv-04324-LB – ECF No. 91 at 21–22.

member, sold methamphetamine, carried a gun in his waistband, and "had made it clear that 'he was not going back to prison.'" *Id.* at 1077–78. After police officers converged on Cruz's car in marked and unmarked police cars, Cruz tried to escape, backing his SUV into one police car, but eventually stopped. *Id.* at 1078. The officers got out of their cars, weapons drawn, and shouted to Cruz (as he allegedly got out of his car) to get on the ground. *Id.* Four officers said that he reached for his waistband, and five officers shot about 20 shots in two to three seconds. *Id.* Police officers found Cruz's body tangled in his seatbelt and hanging from it. *Id.* He had no weapon, but they later recovered a gun from the passenger seat. *Id.* The Ninth Circuit said:

> It would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire.

*Id.*; *see id.* at 1079–80 (disputes of fact and inconsistent reports about whether Cruz reached for the gun precluded summary judgment).

The plaintiffs also contend that — even if Officer Hughes's first two shots were the reasonable exercise of force — the second volley of twelve shots was not reasonable because Mr. Perkins was no longer a threat.[177] Given the split-second reaction times and the fact that four officers shot, the timeline probably is not amenable to parsing. *See Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (15 shots in 10 seconds in case involving traffic stop of car with a broken window, flight and a high-speed chase, and subsequent stop and subsequent high-speed flight). The initial shots did not "clearly incapacitate[]" Mr. Perkins and "end[] . . any threat," or involve Mr. Perkins's "clearly giv[ing] himself up." *Id.* at 777.

Citing *Cruz*, the plaintiffs argue that summary judgment is improper because the only evidence is the officers' self-serving testimony and "a jury could find that that [sic] [Mr.] Perkins would have no reason to reach, and did not reach, for a toy gun in front of multiple armed officers."[178] *Cruz* is distinguishable because there, "circumstantial evidence . . . could give a reasonable jury pause.

---

[177] *T.D.P.* Opp., No. 3:16-cv-04132-LB – ECF No. 110 at 23–24; *Perkins* Opp., No. 3:16-cv-04234 – ECF No. 91 at 25.

[178] *T.D.P.* Opp., No. 3:16-cv-04132-LB – ECF No. 110 at 20 (citing *Cruz*, 765 F.3d at 1080); *Perkins* Opp., No. 3:16-cv-04234 – ECF No. 91 at 21–22.

Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his

waistband?" 765 F.3d at 1079. The *Cruz* court elaborated:

> Cruz probably saw that he was surrounded by officers with guns drawn. In that circumstance, it would have been foolish — but not wholly implausible — for him to have tried to fast-draw his weapon in an attempt to shoot his way out. But for him to make such a gesture when *no* gun is there makes no sense whatsoever. A jury may doubt that Cruz did this. Of course, a jury could reach the opposite conclusion. It might believe that Cruz *thought* he had the gun there, or maybe he had a death wish, or perhaps his pants were falling down at the worst possible moment. But the jury could also reasonably conclude that the officers lied.

*Id.* at 1079–80.

The undisputed facts here, in contrast to *Cruz*, is that Mr. Perkins had a gun. Unlike *Cruz*, there

is corroboration of the officers' account. *See Scott*, 39 F.3d at 915 (examining evidence other than

the officers' testimony "to determine whether the officer's story is internally consistent and

consistent with other known facts") (citation omitted). The Camera 2 video shows the gun in midair,

next to Mr. Perkins's right hip, and below his raised right arm.[179] The morphine and

methamphetamine in Mr. Perkins's system were "at toxic levels."[180]

Still, excluding Mr. Wise's testimony, a reasonable jury could find from the officers' testimony

that Mr. Perkins did not point a gun at the officers, the gun was swinging at his side in a walking

motion, he was walking calmly down the sidewalk in the direction of (but not directly at) the

officers, and it was feasible for officers (particularly Officer Hughes) to give a warning (such as

"get on the ground or I'll shoot" or "drop the gun or I'll shoot"[181]) in the interval between Officer

Hughes's seeing Mr. Perkins and firing the shots. But under this scenario, the officers are entitled to

---

[179] Fredericks Report, Ex. C to Sorensen Decl. – ECF No. 112 at 114 (image-examination PDF, slides 49–61).

[180] Peterson Report – ECF No. 102-24 at 7 (¶ 6).

[181] Although some officers testified that they heard warnings, no officer said he gave a warning. The ShotSpotter evidence establishes only a command that sounds like "ground" before the first two shots were fired and a command to "get on the ground" before the remaining shots were fired. ShotSpotter Audio Recording, Ex. A to Greene Decl. – ECF No. 94-22; Forensic Report, Ex. B to Greene Decl. – ECF No. 94-23 at 5.

qualified immunity.[182] Existing precedent does not "place[] the statutory or constitutional question beyond debate." *Muellenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotation omitted); *see Plumhoff*, 572 U.S. at 779. Indeed, the hypothetical scenario in *Cruz* — it would be reasonable for police to shoot a suspect if he reaches for a gun in his waistband (or reaches there for some other reason) if the suspect demonstrates dangerous and erratic behavior up to that point — shows that qualified immunity is appropriate here.

The cases that the plaintiffs cite do not compel a different result because they do not involve split-second reactions to erratic behavior or establish that officers acting in similar circumstances violated the Fourth Amendment.[183]

In *C.V. v. City of Anaheim*, the police responded to a 911 call about a suspected drug dealer, armed with a shot gun that turned out to be a BB gun, loitering in the parking area of an apartment complex. 823 F.3d 1252, 1253–54 (9th Cir. 2016). The officers reported that they told the decedent to put his hands up and drop the gun, but their accounts were inconsistent about how he responded ("quick movement" to grab the barrel of the gun that was resting on the ground versus holding the gun with the tip pointing straight up). *Id.* at 1255–56. The Ninth Circuit held that a jury could conclude that the decedent was not pointing the gun at the officers and was complying as the officers told him to drop the gun, and the officers did not give him time to comply or give a warning before they shot him. *Id.* at 1256. There thus were disputes of fact about perceived risk and an ability (depending on the resolution of those facts) to warn before shooting. By contrast, this case involves the immediate risk of an armed person advancing toward a group of police officers, who had only seconds to respond.

---

[182] Officer Faeth's statement — that he just saw Mr. Perkins's hand on the gun — does not necessarily render the force unreasonable, given the similarity to the *Cruz* hypothetical. *See Cruz*, 765 F.3d at 1078. But it might influence how a jury would evaluate and credit the officers' different reports of what they saw.

[183] *T.D.P.* Opp., No. 3:16-cv-04132-LB – ECF No. 110 at 27–29; *Perkins* Opp., No. 3:16-cv-04234 – ECF No. 91 at 21–22.

The other cases also involve scenarios where the threats were less immediate and the officers had time to give a warning. *George v. Morris* involved an elderly man, using a walker, holding a gun, with disputes of fact about whether the gun was pointed at the ground. 736 F.3d at 838. *Curnow* also involved disputes of fact about whether the decedent, who was not directly facing the officers, was pointing the gun down or at the officers when they shot him. 952 F.2d at 324–25. In *Lopez*, under a plausible view of the facts, a teen-aged boy was carrying a toy AK-47 in broad daylight, in a park moving away from the officers. *Id.* at 1002–03, 1007–08. In *A.K.H. v. City of Tustin*, the unarmed decedent was complying with the police officer's command to take his hand out of his pocket. 837 F.3d 1005, 1008–09, 1012–13 (9th Cir. 2016).

In sum, if Mr. Wise is available to testify at trial, disputes of material fact (about whether the gun was in the waistband or in Mr. Perkins's hand) preclude summary judgment. If Mr. Wise is not available to testify, then the officers are entitled to qualified immunity, and the court will grant summary judgment in their favor on the Fourth Amendment excessive-force claim.

### 2. Due Process — Parent-Child Relationship — Fourteenth Amendment — 42 U.S.C. § 1983

The officer-defendants move for summary judgment on the Fourteenth Amendment claims on the grounds that the officers' conduct did not shock the conscience and they in any event are entitled to qualified immunity. The court holds that the officers are entitled to qualified immunity.

#### 2.1 Governing Law

The Fourteenth Amendment's substantive due-process clause protects against the arbitrary or oppressive exercise of government power. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). Parents and children may assert Fourteenth Amendment substantive due-process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (parents and children); *Curnow*, 952 F.2d at 325 (parent); *Crumpton v. Gates*, 947 F.2d 1418, 1421–24 (9th Cir. 1991) (child); *cf. Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992) (sibling has no constitutionally protected interest in brother's companionship under Section 1983).

The standard that a plaintiff must satisfy to establish a due-process violation under the Fourteenth Amendment is higher than the standard for excessive-force claim under the Fourth Amendment. Whereas an alleged Fourth Amendment violation is evaluated under a reasonableness standard, *Ohio v. Robinette*, 519 U.S. 33, 34 (1996), "the Due Process Clause is violated by executive action only when it 'can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense[,]'" *Lewis*, 523 U.S. at 847 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)); *accord Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation.") (citing *Lewis*, 523 U.S. at 846). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). If the deliberate-indifference standard applies, the plaintiffs must show that the officers acted with "conscious or reckless disregard of the consequence[s] of [their] acts or omissions." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quotation omitted). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230.

In *Zion v. County of Orange*, the Ninth Circuit rejected an argument that the "deliberate indifference" standard applied where the police fired a total of 18 shots at the victim, half of them at close range, while the suspect was already on the ground. 874 F.3d 1072, 1077 (9th Cir. 2017). The Ninth Circuit instead applied the heightened "purpose to harm" standard, holding that the police officer's actions came in rapid succession without time for reflection. *Id.* "Whether excessive or not, the shootings served the legitimate purpose of stopping a dangerous suspect" and thus did not violate the Fourteenth Amendment. *Id.*

### 2.2 Application

The incident lasted seconds, and deliberation was impractical. If the more stringent purpose-to-harm standard applies, the plaintiffs have not met it. If the deliberate indifference standard applies, there is insufficient evidence to support the conclusion that the officers acted with conscious or

reckless disregard of the consequences of their acts or omissions. *Tatum*, 768 F.3d at 821. In any event, the defendants are entitled to qualified immunity.

### 3. *Monell* and Supervisory Liability — 42 U.S.C. § 1983

The plaintiffs bring *Monell* and supervisory-liability claims against the City of Oakland and the OPD's former police chief on the theory that Oakland and the OPD failed to train police officers adequately on the need for a warning, and that failure caused the constitutional injury.[184] The City and former chief move for summary judgment on the grounds that (1) they train officers to give verbal warnings when feasible before using deadly force, (2) a shortfall in one officer's training does not establish liability, and (3) any training failure did not cause the injury here because all officers testified that they knew that they had to give a warning when feasible.[185] The court grants the summary-judgment motion because the training was not deficient and did not cause the injury.

### 3.1 Governing Law

Local governments can be sued under § 1983 if the public entity maintains a custom, practice, or policy that amounts to deliberate indifference to a plaintiff's constitutional rights, and the policy results in violation of a plaintiff's constitutional rights. *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 690–91 (1978). There are three ways to show a policy or custom:

> (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quotation omitted). The practice or custom must consist of more than "random acts or isolated events" and instead, must be the result of a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1988), *overruled on other grounds by Bull v. City and Cty. of San Francisco*, 595 F.3d 964

---

[184] *T.D.P.* Opp., No. 3:16-cv-04132-LB – ECF No. 110 at 30; *Perkins* Opp., No. 3:16-cv-04234 – ECF No. 91 at 25–26.

[185] Reply – ECF No. 129 at 21–22.

(9th Cir. 2010); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Thus, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

The former police chief "may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks and citation omitted). "Supervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates . . . ." *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (citation omitted).

### 3.2    Application

The OPD's official policy is that warnings must be given when feasible.[186] The plaintiffs contend that the defendants were deliberately indifferent when they failed to train on that policy.[187] As evidence of that failure, they assert that Sergeant Turner, Officer Thomas Sotto, and the former police chief testified that there are circumstances where warnings are not required even if they are feasible.[188] Sergeant Turner and Officer Sotto were OPD instructors on the use of force.[189]

Sergeant Turner testified that giving a warning "depends on the circumstances" and that a warning should be given "when safe to do so."[190] Officer Sotto testified that he "[did not] know exactly . . . what is taught and how it's taught."[191] The former police chief testified that "[t]raining

---

[186] OPD Policy, Ex. 1 to Sotto Dep. – ECF No. 129-2 at 35–36; Sotto Dep. – ECF No. 129-3 at 37–38 (pp. 67:19–68:2), 39 (p. 93:4–20); Whent Dep. – ECF No. 129-3 at 58 (p. 48:19–23).

[187] *See, e.g.*, *Perkins* Opp., No. 3:16-cv-04234-LB at 25–26.

[188] *T.D.P.* Opp., No. 3:16-cv-04132-LB – ECF No. 110 at 30; Perkins Opp., No. 3:16-vb-04234-LB at 25–26.

[189] *See* Turner Dep. – ECF No. 121 at 16 (pp. 50:22–51:25), 18 (pp. 59:16–60:19), 20 (p. 68:15–22); Sotto Dep. – ECF No. 129-3 at 34–36 (pp. 60:23–62:4), 37–38 (pp. 67:25–68:4), 39 (p. 69:4–20).

[190] Turner Dep. – ECF No. 121 at 20–21 (pp. 66:23–68:12, 69:25–70:21).

[191] Sotto Dep. – ECF No. 128 at 7–8 (pp. 21:12–22:2).

did dictate that a warning should be given if feasible" and that "it's in the training."[192] All officers testified that they knew they had to give a warning if it was feasible.[193] The plaintiffs have not established a failure to train on warnings or that any failure caused the injury here. The court grants summary judgment on the *Monell* and supervisory-liability claims.

### 4. Bane Act Claim

The defendants move for summary judgment on the plaintiffs' claims for a violation of the Bane Act, California Civil Code section 52.1. The Bane Act prohibits interference or attempted interference with a person's rights under the U.S. or California Constitutions and laws by "threats, intimidation, or coercion." Cal. Civ. Code § 52.1(a)–(b). The defendants contend that the plaintiffs did not establish (1) a threat independent of the constitutional violation (here, the claim of excessive force) or (2) a genuine issue of material fact that the force was unreasonable.[194] The court denies the summary-judgment motion. The plaintiffs need not allege coercion beyond the coercion inherent in the excessive force, and disputes of fact about the reasonableness of the force — with or without Mr. Wise's testimony — preclude summary judgment.

First, the plaintiffs do not need to establish a threat, intimidation, or coercion that is "transactionally independent" from the constitutional violation. *See Reese v. Cnty of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City and Cty. of San Francisco*, 17 Cal. App. 5th 766, 799–802 (2017)). (The Bane Act does require a specific intent to violate the Fourth Amendment. *Id.*)

Second, the disputes of fact that preclude summary judgment on the Fourth Amendment excessive-force claim preclude summary judgment on the Bane Act claim.[195] The parties dispute

---

[192] Whent Dep. – ECF No. 122 at 14 (pp. 48:19–49:4).

[193] Hughes Dep. – ECF No. 111 at 17 (p. 57:5–8); Cairo Dep. – ECF No. 119 at 18 (p. 59:4–6); Barnard Dep. – ECF No. 120 at 13 (p. 40:21–25); Turner Dep. – ECF No. 121 at 20–21 (pp. 69:8–70:1).

[194] Mot. – ECF No. 94 at 32–33.

[195] Even if officers are entitled to qualified immunity on Fourth Amendment claims, they may remain liable for damages under the Bane Act. *Woods v. City and Cty. of San Francisco*, No. 2018 WL 4896766, at * 10 (N.D. Cal. Oct. 9, 2018) (citing *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1038–39,

United States District Court
Northern District of California

whether the gun was in Mr. Perkins's waistband (as Christopher Wise reports) or in his hand (as the officers report). Even if Mr. Wise is unavailable to testify, the claim survives. As discussed in the Fourth Amendment analysis, a reasonable jury might find — depending on how it weighs evidence and credibility —that Mr. Perkins did not point a gun at the officers, the gun was instead swinging at his side in a walking motion, he was walking calmly down the sidewalk in the direction of (but not at) the officers, and it was feasible for officers to give a warning before they shot. It is the jury's role to sift through the disputed factual contentions, draw inferences from them, and assess the witnesses' credibility. *Glenn*, 673 F.3d at 871. This is particularly true when the police shoot and kill the decedent, who cannot challenge what may be the officers' self-serving account. *Gonzales*, 747 F.3d at 795; *Gregory*, 523 F.3d at 1107. The court denies the motion for summary judgment on the Bane Act claim.

### 5. Negligence and Wrongful Death

The defendants move for summary-judgment on the plaintiffs' claims for negligence and wrongful death on the ground that the officers' conduct was objectively reasonable.[196] A negligence claim may be predicated on a use of excessive force. *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013); *see Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1263 (2006) (elements of a wrongful-death claim are the tort (negligence or other wrongful act), the death, and resulting damages). The court denies the motion because the same fact disputes preclude summary judgment. Also, under California law, the officers' tactical conduct and decisions that precede a shooting are

---

1045 (affirming qualified immunity on a Fourth Amendment excessive-force claim but reversing summary judgment on a Bane Act claim on the same facts)).

[196] Mot. – ECF No. 94 at 33–34. The defendants also moved for summary judgment on T.D.P.'s claim of negligent failure to train and supervise. *Id.* The *T.D.P.* opposition does not discuss the negligent-failure-to-supervise-and train claim and instead addressed only negligence in the form of excessive force. Opp. – ECF No. 110 at 31–33. The court grants summary judgment on negligence predicated on a failure to train and supervise. Even if the court deems the argument subsumed in T.D.P.'s *Monell* and supervisory-liability claims, the analysis there supports a similar conclusion here: the policy required warnings when feasible, and all officers knew that they must give a warning when feasible.

relevant in the determination of whether the officers' conduct was reasonable under the totality of the circumstances. *Hayes*, 736 F.3d at 1236.

### 6. Assault and Battery

The defendants move for summary-judgment on the plaintiffs' claims for assault and battery on the ground that the officers' conduct was objectively reasonable.[197] "In order to prevail on a claim of battery against a police officer, the plaintiff bears the burden of proving the officer used unreasonable force." *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 (2004) (citation omitted). The test for reasonableness for a state-law battery claim against a police office is the same test for a Section 1983 claim alleging a Fourth Amendment claim. *Id.*; *see Hayes*, 736 F.3d at 1232. The court denies the motion because the same fact disputes preclude summary judgment.

### 7. Punitive Damages

The defendants move for summary judgment on the ground that that the officers' conduct was reasonable and in any event was not reckless or callous.[198] A § 1983 plaintiff may recover punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The court denies the motion. The disputes of fact mean that the issue is appropriately reserved for the jury.

### CONCLUSION

The court grants in part and denies in part the summary-judgment motion: (1) the court denies the motion on the Fourth Amendment excessive-force claim because eyewitness Christopher Wise's account creates a genuine dispute of material fact (but if he is not a trial witness, then the officers are entitled to qualified immunity); (2) the court grants the motion on the Fourteenth Amendment

---

[197] Mot. – ECF No. 94 at 34.

[198] *Id.* at 34–35.

claim; (3) the court grants the motion on the *Monell* and supervisory-liability claims; and (3) the court denies the motion on the state-law claims.

**IT IS SO ORDERED.**

Dated: February 24, 2019



LAUREL BEELER
United States Magistrate Judge